[No. 31657.   Department Two.   November 5, 1951.]

CARL A. BERGSTROM, *Respondent*, v. A. WALTER
OLSON, *Appellant*.[1]

[1]Reported in 236 P. (2d) 1052.

*Rummens, Griffin & Short* and *Paul R. Cressman,* for appellant.

*Nolte & Stella,* for respondent.

WEAVER, J.—The question presented is: Did defendant Olson buy a one-half interest in plaintiff Bergstrom's going business for eleven thousand dollars, or, did defendant make a capital contribution of eleven thousand dollars to a new joint enterprise to which plaintiff contributed his going business?

In April, 1948, plaintiff was a sole proprietor, doing business under the name of Pioneer Roofing Company. On April 28, 1948, the plaintiff, Mr. Bergstrom, and the defendant, Mr. Olson, signed a partnership agreement which provided, so far as is here material, as follows:

"A. Walter Olson *has paid* to Carl A. Bergstrom the sum of eleven thousand ($11,000.00) dollars for a one-half interest in the goodwill, inventory, stock of merchandise, furniture and fixtures, and all other assets *including moneys in bank* and accounts receivable, of the going business known as the PIONEER ROOFING COMPANY, located at 3001 Chandler Street, Tacoma, Pierce County, Washington. It is understood that this purchase gives each Partner an equal share in the capital of said Partnership. . . .

"If A. Walter Olson desires to sell his interest in the Partnership to Carl A. Bergstrom within six months after April 28, 1948, it is agreed between the Partners that he shall receive for his interest and Carl A. Bergstrom will in such event pay to A. Walter Olson the sum of Eleven Thousand ($11,000.00) Dollars therefor." (Italics ours.)

If this agreement were the only evidence before us, we would have no hesitancy in holding that Mr. Olson, the defendant, purchased a half interest in the business owned by Mr. Bergstrom, and that the eleven thousand dollars became the property of Mr. Bergstrom. The terms of the partnership agreement are not ambiguous.

Plaintiff brought this action to dissolve the partnership, and secure an accounting based upon his claim to the eleven thousand dollars. The defendant, however, cross-complained for a reformation of the contract upon the ground of mutual mistake.

Since 1945, plaintiff had been a subjobber engaged in buying and selling construction materials, especially roofing and siding, to applicators, lumber yards, and hardware stores. He had attempted to secure the right to buy direct from the Flintkote Company in order to increase his percentage of profit. The company, however, had refused to furnish materials direct to him, as his net worth was insufficient. He needed additional capital and credit in his business.

For some six weeks prior to April 12, 1948, plaintiff negotiated with defendant Olson, a man of considerable means. On April 1, 1948, plaintiff's business had a net worth of $5,128.31. On April 12, 1948, he owed The Puget Sound National Bank $6,100, $3,000 of which had been borrowed April 5th. This he disclosed to defendant. On April 12th, plaintiff had $871.26 cash on hand and in the bank.

The testimony of plaintiff and defendant is in hopeless conflict. We look, therefore, to the entire record to find their intent from what they did, from how they acted, and from the interpretation the parties put upon the transaction at the time, in order to determine whether there was a mutual mistake made by the parties when they signed the partnership agreement on April 28, 1948.

As a result of their prior oral negotiations, defendant went to the bank on April 12, 1948. He transferred $11,000 cash from his savings account to the account of the Pioneer Roofing Company. He signed the necessary authorization for the bank to pay checks signed by either party. The same day, plaintiff went to the bank, signed the same authorizations to the bank, and paid to the bank, *out of the partnership checking account*, $6,119.20, the amount due on his promissory notes, plus interest.

It was subsequently agreed between the parties that the books of the partnership should be opened as of April 1,

1948, in order to avoid taking an inventory in the middle of the month.

Sometime after April 12th, the date of the bank deposit, and prior to April 28, 1948, the parties went to a lawyer suggested by defendant, to have their partnership agreement drafted. He testified that in drawing the agreement he intended to represent both parties. After several minor changes, the agreement was signed by the parties. The scrivener testified:

"Q. Now, did the words 'Moneys in the bank' include the $11,000.00? A. That was my understanding. . . . A. I intended, Mr. Nolte, that that agreement should recite that Olson was putting in his business, subject to his debts, and throwing it in one pile, or had already thrown it and were splitting it down the middle."

The partnership books were set up by the bookkeeper who had kept plaintiff's accounts since he started business in 1945. He testified that he had set up the books from an explanation of the working arrangement given him by plaintiff. The partnership books of account were kept in the office, were available to both parties, were used to make monthly financial statements for the partners, and were used as the basis for making the Federal partnership income tax return for the year 1948.

The books of account are revealing. They show unmistakably a partnership starting with a capital of $22,000. Capital account entries for April, 1948, credit $11,000 to defendant, and credit $5,128.31 (the net worth of the business on April 1, 1948) to plaintiff. On June 30, 1948, $5,871.69 was credited to plaintiff's capital account and designated in a journal entry "To set up as Goodwill of business to equalize with *incoming partner's investment of $11.000.00* for ½ interest in the business." Thus, on June 30, 1948, each had a capital account of $11,000. On December 31st, each capital account was credited with one half of the partnership profits for 1948 and debited with the drawing account of each for the period to that date.

The balance sheet of the 1948 partnership Federal income tax return, prepared by the bookkeeper from the partner-

ship records, shows "Partners' Capital Accounts: C. A. Bergstrom $11,000.00, A. W. Olson $11,000.00," as liabilities. The same balance sheet shows "Goodwill $5,871.69" as an asset, with no further identification. The 1948 individual Federal income tax return of plaintiff makes no reference, as a capital gain or otherwise, to a sale of *a half interest* in a business, having a net worth of $5,128.31, for $11,000.00.

A certified public accountant, whose eminent qualifications were admitted by counsel for both parties, testifying as an expert after an examination of the partnership books of account and tax returns, said:

"There was everything about the entries, that is the explanation as well as the entries, themselves that indicate that each person was making an investment in a business, and not a sale or purchase between individuals. . . .

"Beyond a shadow of a doubt, the books and the return both indicate that each party made an investment in the business and that there was not a sale between the parties."

In none of the partnership books of account, financial statements, or tax returns, does a partnership liability in favor of plaintiff appear.

Against all of this, most of which has been gleaned from the written records of the partnership and the testimony of third parties, Mr. Bergstrom, the plaintiff, maintains that he sold a half interest in his business to the defendant for $11,000, that the $11,000 became his "personal funds," and that he told defendant he would leave the cash in the partnership bank account for use in the event defendant desired to withdraw from the partnership at the end of six months as provided in the agreement of April 28th. He testified the agreement of that date expressed his "complete thinking" on the matter. All this, defendant denied. He testified that he did not pay plaintiff $11,000; he contributed $11,000 cash to the business.

Shortly after April 12, 1948 (the date of the bank deposit), the partnership furnished a financial statement to the Flintkote Company. It became a Flintkote dealer. The business prospered.

The six months' period expired, and the $11,000 was not withdrawn. Plaintiff testified that, in the late fall of 1948, he attempted to assert an interest in the money, but that defendant refused to allow its withdrawal. Defendant denied this and testified that the first time plaintiff asserted a claim for $11,000 was at the time his amended complaint was filed on December 8, 1949.

On January 21, 1949, plaintiff gave defendant notice of his desire to terminate the partnership. We find no evidence that this was motivated by defendant's refusal to allow plaintiff to withdraw the money. This notice, however, was abandoned. On September 13, 1949, a new notice of termination was given by plaintiff. Neither notice gave any reason for termination, and, at the trial, plaintiff offered none.

Efforts of the parties to buy or sell failed, and, on November 7, 1949, plaintiff filed his complaint. He stood upon the terms of the partnership agreement and prayed for dissolution of the partnership, for the appointment of a receiver, for liquidation of the business, and for judgment in the sum of $5,871.69. This was the difference between the $11,000, which plaintiff claimed as his, and the net worth of his business on April 12, 1948. It was the amount carried on the partnership books as "Goodwill" and credited to plaintiff's capital account. December 8, 1949, plaintiff filed an amended complaint, in which he changed his theory. He asked for judgment in the sum of $11,000, making no reference to the net worth of the business or of his indebtedness of $6,119.20 existing April 12, 1948.

January 3, 1950, the court appointed a receiver. The business was liquidated. February 27, 1950, the receiver was discharged. He paid $6,996.23 cash into the registry of the court for distribution. Prior to appointment of the receiver, plaintiff had withdrawn $475 more than defendant.

Defendant answered and cross-complained for reformation of the agreement upon the ground of mutual mistake, alleging the true agreement to be that he, the defendant, contributed $11,000 cash *to the partnership*, and plaintiff contributed his business, thus putting additional capital

into the business and making it possible for the partnership to purchase materials direct from the Flintkote Company.

October 1, 1950, the trial court entered its findings of fact. Judgment (decree) was entered November 2, 1950. The latter directed the clerk of the court to pay plaintiff $6,-996.23, and gave judgment against defendant for $3,528.77. Thus, the plaintiff's judgment was for $11,000, less the $475 previously withdrawn. The decree also restrained plaintiff from the use of the name, Pioneer Roofing Company, and from the use of the telephone number Garland 0124. Defendant has appealed.

■■ This is an action in equity. The trial court having made findings of fact, we have accorded them great weight in reviewing the sufficiency of the evidence to support the decree. *Bacon v. Gardner*, 38 Wn. (2d) 299, 229 P. (2d) 523. However, findings of fact in an equity case are not binding to the same extent that they are in actions at law. *Eckley v. Bonded Adjustment Co.*, 30 Wn. (2d) 96, 190 P. (2d) 718, 1 A. L. R. (2d) 717; *Osawa v. Onishi*, 33 Wn. (2d) 546, 206 P. (2d) 498. We are required by Rem. Rev. Stat., § 1736 [P.P.C. § 5-65], to consider the evidence *de novo*. It is our duty to make an independent examination of all of the evidence as disclosed by the statement of facts. If we ascertain from the entire record that the findings are not supported by a fair preponderance of the evidence, the findings will be disregarded. *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 126 P. (2d) 584, and cases cited. An examination of the record in this case convinces us that the findings are not supported by a fair preponderance of the evidence. We have found the facts to be as set forth heretofore.

■ The rule applicable where reformation for mutual mistake is sought has been well stated in 2 Restatement of Contracts, 968, § 504, as follows:

"Where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby."

This rule has been previously adopted by this court. *Akers v. Sinclair*, 37 Wn. (2d) 693, 226 P. (2d) 225.

█ Parol evidence is admissible to show mutual mistake. *Nadreau v. Meyerotto*, 35 Wn. (2d) 740, 215 P. (2d) 681; *Bacon v. Gardner, supra*. Thus, the true intention of the parties can be determined, and from that intention, existing at the time of the transaction, it will be determined whether a mutual mistake actually existed. If the intention of the parties was identical at the time of the transaction, and the written agreement· did not express that identical intention, then a mutual mistake occurred.

█ However, an action for the reformation of a writing upon the grounds of mutual mistake must be supported by clear, cogent, and convincing evidence, and if there is any doubt as to the parties' true intention, reformation will not be granted. But a mere denial by one party that a mutual mistake was made, will not deprive the other party of his right to relief (*Fay v. Best*, 137 Wash. 1, 241 Pac. 354); nor is it necessary that the evidence pointing to mutual mistake be uncontradicted. *Akers v. Sinclair, supra*. Here, we have a situation where the instrument was designated to carry into effect an existing binding agreement, but by mutual mistake, failed to do so. See *Hendrickson v. Lyons*, 121 Wash. 632, 209 Pac. 1095.

Plaintiff's contention that he is entitled to the $11,000 is not supported by the record. That he left the money in the partnership bank account in order to repay defendant in the event of his withdrawal within six months, is completely refuted by the fact that plaintiff immediately paid the obligation to the bank out of the partnership bank account, thus reducing the balance below the amount necessary to accomplish the purpose for which plaintiff said it had been deposited. No partnership liability to plaintiff for this amount ever appeared in the partnership accounts. Had defendant bought a half interest in the business, there would have been no necessity for the accounts to refer to "Goodwill" and to credit plaintiff therewith. It would have been a transaction between individuals, and the partnership capi-

tal account of each would have appeared as one half of $5,128.31, the net worth of the business when the transaction took place.

■ Defendant (appellant) has shown by clear, cogent, and convincing evidence: (1) that the agreement of April 28, 1948, did not express the true intention of the parties on that date; (2) that, by mutual mistake, it failed to carry into effect an existing binding agreement; (3) that both parties, either expressly or impliedly, assented to the true contract between them; (4) that it should be reformed to state that each party contributed equally to the capital of a new enterprise.

There having been no cross-appeal, we do not disturb that portion of the decree dated November 2, 1950, whereby plaintiff was restrained from using the name of Pioneer Roofing Company and from using the telephone number Garland 0124. In all other respects, the decree is reversed and the trial court directed to order disbursement of the funds in the registry of the court according to the rights of the parties, in a manner not inconsistent with this opinion. Appellant is allowed his costs.

SCHWELLENBACH, C. J., MALLERY, GRADY, and HAMLEY, JJ., concur.