[No. 34537-1-I.   Division One.   May 6, 1996.]
*In the Matter of the Marriage of* FRANCES E. SCHWEITZER, *Appellant*, and FABIAN S. SCHWEITZER, *Respondent.*

---

[25]ER 801(c).

[26]ER 802.

[27]RAP 2.5(a).

*Rodney G. Pierce* and *Pierce & Johnson,* for appellant.

*Harold B. Coe* and *Coe, Nordwall & Liebman*; and *Janet L. Comin,* for respondent.

BECKER, J. — The issue in this case is whether a community property agreement governs the characterization of property in a dissolution notwithstanding the parties' recollection that they intended it to become effective at death. The written agreement provides that all property "now owned or hereafter acquired" by either spouse was converted to community property at the time it was signed. The trial court, using parol evidence, construed the agreement as not taking effect until death. Because parol evidence may not contradict the terms of a written agreement, we reverse.

## I.

When the parties were married in 1974, the husband, Fabian Schweitzer, had substantial separate assets. His new wife, Frances, owned much less.

During the marriage, the parties purchased a standard-form community property agreement at a stationery store and signed it hastily just before Fabian went on an extended foreign trip. Paragraph I purported to convert immediately into community property everything that either of them "now owned or hereafter acquired," while paragraph II provided for community property to vest in the survivor upon the death of either spouse:

### COMMUNITY PROPERTY AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS:

This agreement, made and entered into this day of March 8, 1981, by and between Fabian S. Schweitzer and Frances E. Schweitzer, husband and wife, of King County, State of Washington, pursuant to the provisions of Section 26.16.120RCW, permitting agreements between husband and wife fixing the status and disposition of community property

to take effect upon the death of either, Witnesseth: That, in consideration of the love and affection that each of us has for each other, and in consideration of the mutual benefits to be derived by each of us, it is hereby agreed, covenanted, and promised as follows:

## I.

That all property of whatsoever nature or description whether real, personal or mixed and wheresoever situated now owned or hereafter acquired by us or either of us, including separate property, shall be considered and is hereby declared to be community property, and each of us hereby conveys and quit claims to the other his or her interest in any separate property he or she now owns or hereafter acquires so as to convert the same to community property.

## II.

That upon the death of either of us, title to all community property as herein defined shall immediately vest in fee simple in the survivor.

IN WITNESS WHEREOF, we Fabian S. Schweitzer and Frances E. Schweitzer have hereunto set our hands this 8 day of March, 1981.

The signatures of Fabian and Frances Schweitzer were notarized. The lines for witness signatures were left blank.

At their dissolution trial, Frances sought to apply the community property agreement to the characterization of property. Both parties indicated that at the time of signing, neither of them intended the agreement to change the character of their property. After they signed it, neither of them altered the way they dealt with the various items of property. Frances said that she understood the document as something that would provide for her in case "anything happened" to Fabian.

The trial court found that the agreement was an estate planning document, not intended to work a conversion of all separate property to community property until one of

the spouses died. Accordingly the court disregarded the agreement for purposes of characterization. The court then characterized several assets as the husband's separate property. From this ruling, from the findings of fact that flow from it, and from the eventual distribution of funds, Frances appeals.

The issue comes before us as one of contract interpretation.[1] Did the trial court err in concluding that the agreement does not reflect an intent to work an immediate conversion to community property?

In a dissolution proceeding the trial court is charged with dividing all property, separate and community, so that it appears just and equitable.[2] Character of property is not a controlling factor in the division, but the trial court must determine the correct character of the property before division is ordered.[3] Unless interpretation of the agreement can obliterate the effect of paragraph I, the court should have characterized all the parties' property as community property prior to distribution.

The preamble of the Schweitzer agreement refers to RCW 26.16.120. That statute specifically authorizes interspousal agreements converting all community property to separate property of the surviving spouse upon the death of the other. Despite the lack of specific legislative grace, additional provisions for an immediate conversion into community property, as in paragraph I of the Schweitzer agreement, are permissible[4] and commonly used.[5] In *Bosone v. Bosone*, this court affirmed a finding that an agreement substantially similar to the Schweitzers'

---

[1]Neither party argues for the applicability of the two-pronged analysis used to determine the validity of prenuptial agreements that waive a spouse's statutory right to equitable distribution. *See In re Marriage of Matson*, 107 Wn.2d 479, 482, 730 P.2d 668 (1986).

[2]RCW 26.09.080.

[3]RCW 26.09.080; *Baker v. Baker*, 80 Wn.2d 736, 745, 498 P.2d 315 (1972).

[4]*Volz v. Zang*, 113 Wash. 378, 194 P. 409 (1920).

[5]*See generally* R. Brachtenbach, *The Community Property Agreement Revisited*, 29 Gonz. L. Rev. 11 (1993).

converted all separate property to community property as of the date of the agreement.[6]

■ The governing statute provides that such agreements are to be "witnessed, acknowledged and certified in the same manner as deeds to real estate."[7] Since deeds no longer require witnesses,[8] neither do community property agreements. The lack of witnesses does not invalidate the agreement.

■ The intent of the parties is the touchstone for interpreting any contract.[9] As the trial court understood the parties' testimony, immediate conversion was not the effect either of them intended the agreement to have when they signed it. Relying on their testimony, the court interpreted the agreement as having no effect until death. Fabian argues that the court was properly applying what is referred to in *Berg v. Hudesman* as the "context rule"[10] of interpretation:

> Determination of the intent of the contracting parties is to be accomplished by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties[11]

■ Extrinsic evidence under *Berg* may be used to determine what the terms in a written contract meant to the contracting parties in the context of their particular circumstances, even when the words used are unambigu-

---

[6]*Bosone v. Bosone*, 53 Wn. App. 614, 618, 768 P.2d 1022 (1989).

[7]RCW 26.16.120.

[8]RCW 64.04.020.

[9]*Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990) (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973)); *accord Scott Galvanizing, Inc. v. Northwest Enviroservices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993).

[10]*Berg*, 115 Wn.2d at 667.

[11]*Berg*, 115 Wn.2d at 667.

ous on their face.[12] Under limited circumstances extrinsic evidence may be used to add terms to a contract if the contract is not fully integrated and the added terms are consistent with the written terms.[13] But no authority permits the use of extrinsic evidence to delete or contradict written terms that are inconsistent with the extrinsic evidence.[14] Extrinsic evidence "illuminates what was written, not what was intended to be written."[15]

Here, Fabian seeks to use extrinsic evidence to contradict the terms of paragraph I, the provision for immediate conversion. In paragraph I, each spouse unequivocally agreed to convey to the other an interest in any separate property either one "now owns or hereafter acquires, so as to convert the same to community property." There is no way to interpret these written terms consistently with an intent to have the conversion await the death of one of the parties.

We conclude that the court used parol evidence impermissibly to subtract an entire paragraph from the agreement and give it no effect whatsoever. Because the agreement converted all of Fabian's property to community property as of 1981, the court erred in characterizing any of the property as separate.

## II.

■ Frances also assigns error to the trial court's finding that she should receive only 45 percent of the community property. This finding is reversible only for a manifest abuse of discretion of the trial court's duty, under RCW

---

[12]*Berg*, 115 Wn.2d at 668.

[13]*Berg*, 115 Wn.2d at 670 (citing *Emrich v. Connell*, 105 Wn.2d 551, 556, 716 P.2d 863 (1986)).

[14]*See Berg*, 115 Wn.2d at 670.

[15]*Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 189, 840 P.2d 851 (1992).

26.09.080, to make a division that appears just and equitable.[16]

■ The court saw Fabian as having greater need. At the time of trial he was sixty-two, about twelve years older than Frances. He was semi-retired and suffering from some health problems. A 55/45 split of community property is not an abuse of discretion in these circumstances.

The distribution of all property, including the property mischaracterized as the husband's separate property, amounted to a 60/40 split in his favor. It is not clear that the court would have made the same 55/45 split of community property if it had characterized all the property as community property. Consequently, remand is required.[17]

## III

The final issue is the assignment of financial responsibility for college education costs. During the marriage, Tony Gatewood, the wife's adult son and the husband's stepson, left home to attend a private college. Tony had lived with the parties for twelve years. Fabian expressed opposition to paying any money for his stepson's education as he had made no such contribution to the education of his children from an earlier marriage. Frances decided to pay for Tony's education and living expenses from the salary she earned at her job.

At trial, evidence showed Frances had paid approximately $35,000 from community assets for Tony's tuition and living expenses, and had incurred a similar sum of debt for the same purpose. The trial court ordered Frances to reimburse the community for the funds she had spent on Tony's education and assigned the remaining debts to Frances as her separate liability. Frances appeals from these rulings.

■ "Either spouse, acting alone, may manage and

---

[16]*Lucker v. Lucker*, 71 Wn.2d 165, 167, 426 P.2d 981 (1967).

[17]*In re Marriage of Kraft*, 119 Wn.2d 438, 449, 832 P.2d 871 (1992).

control community property, with a like power of disposition as the acting spouse has over his or her separate property".[18] The statute lists six exceptions to the broad management powers of the acting spouse; outside these six exceptions, either spouse has broad authority to act. A disposition of community funds is within the scope of authority of the acting spouse so long as he or she is acting "in the community interest".[19]

■ The rule is similar with regard to incurring community debt. There is a presumption that money borrowed by one spouse is for the benefit of the community.[20] But the presumption of community benefit may be rebutted by evidence that the funds were devoted, without the other spouse's knowledge, to a purpose that did not benefit the community.[21]

Fabian does not contend that the disputed expenditures fall within any of the six statutory limitations on the acting spouse's power to dispose of community funds. His argument is that the expenditures for Tony's education were not intended for the benefit of the community.

The trial court did not make a specific finding of fact that Frances was not acting on behalf of the community when she spent money and incurred debt for Tony's education. The trial testimony does not conclusively establish or even specifically address whether Frances was acting in the community interest. The most that is clear from the record is that Fabian disapproved of the expenditures to the extent he was aware of them, although he did acknowledge providing a needed signature on a loan document at one point "in order to keep peace in the family". Proof that Fabian refused to consent does not support a conclu-

---

[18]RCW 26.16.030.

[19]*Hanley v. Most*, 9 Wn.2d 429, 461, 115 P.2d 933 (1941).

[20]*In re Marriage of Hurd*, 69 Wn. App. 38, 54-55, 848 P.2d 185 (1993), *review denied*, 122 Wn.2d 1020 (1993).

[21]*Sun Life Assur. Co. of Canada v. Outler*, 172 Wash. 540, 544-49, 20 P.2d 1110 (1933).

sion that the education expenditures were outside the scope of Frances' authority as the acting spouse. Where the facts show that husband and wife simply disagree on a matter involving the management of community property, the decision of the acting spouse is controlling.[22]

To support a conclusion of lack of community benefit, Fabian relies on *In re Marriage of Manry*.[23] The trial court in *Manry* held the wife separately responsible for her personal credit card purchases. She refused to disclose the nature of the purchases to the trial court, thus preventing the husband from meeting his burden of showing that the debts were not incurred for a community purpose. This court held it was not an abuse of discretion for the trial court to hold her responsible for the debts.[24] In contrast to *Manry*, here Fabian knew at trial that these funds and debts were for the purpose of Tony's education. The commitment of community funds for the education of a child of one of the parties, however controversial as between the spouses, is not analogous to a situation where the purpose of the expenditures is unknown. We cannot say as a matter of law that a spouse making such expenditures is never acting in the interest of the community.

Without a specific finding of fact to overcome the presumption of community benefit, there is no support for the specific provisions of the decree that hold Frances separately responsible for expenses incurred for Tony's education. The error is an additional basis for reversal of the decree.

Both parties request attorney fees on appeal. We deny both requests.

Reversed and remanded.

---

[22]*Hanley*, 9 Wn.2d at 469.

[23]*In re Marriage of Manry*, 60 Wn. App. 146, 803 P.2d 8 (1991)

[24]*Manry*, 60 Wn. App. 150-51.

KENNEDY, A.C.J., and COLEMAN, J., concur.

Review granted at 130 Wn.2d 1001 (1996).